### MRS. IDA L. ROBERTSON ET AL. v. J. D. HEFLEY.

#### Decided April 21, 1909.

**1.—Trespass to Try Title—Common Source.**

Where the parties in a suit to recover land admit a common source of title, one can not have been prejudiced by the introduction in evidence of a conveyance to the common source.

**2.—Evidence—Innocent Purchaser.**

Excluding evidence tending only to show that plaintiff was not an innocent purchaser, he having notice of an adverse claim before buying, was not ground for reversal where the judgment in his favor must, on other grounds, be affirmed, irrespective of his right to protection as an innocent purchaser.

**3.—Homestead—Abandonment—New Homestead.**

Though the wife did not join in a deed of the homestead by the husband, it being made to herself, such conveyance passed title when they abandoned the homestead, the husband in good faith selecting and acquiring another home, and the wife removing with him thereto.

**4.—Conveyance—Fraud on Creditors.**

A conveyance of property by a husband to his wife is not shown to be invalid against heirs of the husband by proof tending to show that it was made to place the property beyond the reach of creditors; in the absence of evidence that it was not intended to pass the title, or was to be held by the wife in trust, only the creditors sought to be defrauded could attack it.

Appeal from the District Court of Milam County. Tried below before Hon. J. C. Scott.

*John P. Looney* and *Henderson & Lockett,* for appellants.—The conveyance by the husband to the wife of the homestead is void. Madden v. Madden, 79 Texas, 595; House v. Phelan, 83 Texas, 595.

The court erred in peremptorily instructing the jury to find for the plaintiff, because it appears from the evidence that the deed by W. J. Robertson to his wife Malvina Robertson for the land in controversy, through which plaintiff claims title, was not intended and did not in fact operate to convey the title to said land, but was merely a simulated transfer and there was no change in the ownership, control or possession of said land during the life of said W. J. Robertson, but same remained in his possession until his death and he exercised all the rights of ownership over the same, just as he had previously done, and the purpose of said conveyance was merely to

pretend and not in fact to convey the title, and at the time of his death said property was the community property of said W. J. Robertson and his said wife, and one-half descended to his children through whom defendants claim and they are entitled to one-half thereof. Taylor v. Ferguson, 87 Texas, 1.

*Monta J. Moore, W. T. Hefley,* and *W. A. Morrison,* for appellee.— In an action of trespass to try title, it is not necessary for the plaintiff to deraign title beyond the common source. Rev. Stats., art. 5266; Crabtree v. Whiteselle, 65 Texas, 111; Burns v. Goff, 79 Texas, 239. The land in controversy having been the community property of W. J. Robertson and his wife, and he having made a conveyance of the same to her, the presumption of the law is that he intended the same to become her separate property; and if it became her separate property, the appellants in this case could not have inherited it from W. J. Robertson, as claimed. Story v. Marshall, 24 Texas, 306; Smith v. Boquet, 27 Texas, 507.

FISHER, CHIEF JUSTICE.—Appellee J. D. Hefley instituted this suit in trespass to try title to recover the lands described in the plaintiff's petition, against the defendants, Mrs. Ida R. Robertson, Wilton Lee Robertson, Washington Prentiss Robertson, Charles David Robertson, Mrs. Desdemona Elizabeth Joslin and Mrs. Georgia E Robertson, all of whom answered by general denial and not guilty, except Mrs. Joslin, who did not answer, and against whom judgment final by default was entered.

The court below instructed a verdict for plaintiff against the defendants, and upon which judgment was rendered in plaintiff's favor, and from which all of the defendants, except Mrs. Joslin, have perfected an appeal to this court.

The land in controversy was originally the community property of W. J. Robertson, now deceased, and his wife Mrs. Malvina Robertson, and now Mrs. Hitt, she having married since the death of her first husband. Mrs. Joslin is the daughter of W. J. and Malvina Robertson, and Mrs. Ida Robertson and Mrs. Georgia Robertson are the daughters in law of W. J. and Malvina Robertson. Wilton Lee Robertson, Washington Robertson and Charles Robertson, are the children of the marriage of Ida Robertson and her deceased husband, a son of W. J. and Malvina Robertson. The husband of Mrs. Joslin and the husband of Mrs. Georgia Robertson, sons of W. J. and Malvina Robertson, are both dead. Appellants assert a claim to a part of the community interest of W. J. Robertson, deceased, to the land in controversy. Plaintiff contends that this interest was conveyed by Robertson to his wife Malvina Robertson, and by her down to him. Upon this point the briefs of appellants contain this statement: "Plaintiffs claim title by mesne conveyances from W. J. Robertson, the ancestor of defendants, and defendants claiming under the same source of title, contended that the conveyance by W. J. Robertson to his wife Malvina Robertson, through whom the plaintiff claims, was void; first, because the land was a part of the homestead, and his conveyance to

his wife was void; second, that the deed was never intended to pass title, but was merely a device to simulate a transfer, and the possession was not surrendered and it was never intended to change the status of the title to the land."

The entire evidence contained in the record is as follows:

"1.  The plaintiff offered in evidence the original warranty deed from W. T. Hefley to the plaintiff J. D. Hefley, same bearing date January 25, 1907, and being for the land described in plaintiff's petition, said deed being duly acknowledged by the grantor and duly recorded in the deed records of Milam County, Texas, in Vol. 74, page 396, the said deed reciting a cash consideration of $3,660 and four vendor's lien notes for $1,875, each, due 1, 2, 3 and 4 years after date, with interest from date at 7 percent per annum, payable to the order of W. T. Hefley.

"2.  Plaintiff next offered in evidence an original warranty deed from Mrs. Melvina Hitt and her husband W. N. Hitt to W. T. Hefley for the land in controversy and described in plaintiff's petition, the same bearing date January 2, 1907, and duly acknowledged by both of the grantors in accordance with law, and duly recorded in the deed records of Milam County, Texas, in Vol. 73, pp. 562-565, the said deed reciting a cash consideration of $8,280, paid by W. T. Hefley.

"3.  Plaintiff next offered in evidence an original warranty deed from W. J. Robertson to M. E. Robertson to the land in controversy and described in the plaintiff's petition, the same bearing date of June 14, 1898, and being duly acknowledged for record and duly recorded in the deed records of Milam County, Texas, in Vol. 48, pp. 379-380, and the same reciting a consideration of $5.00, 'and other valuable consideration' paid by the grantees.

"4.  The plaintiff next offered in evidence an original general warranty deed from T. C. Fowler and wife to W. J. Robertson to the land in controversy, bearing date March 18, 1885, and showing that it was filed in the office of the county clerk of Milam County, Texas, on the 7th day of August, 1885, and duly recorded in deed records of said county on the 19th day of August, 1885, in Vol. 14, on pages 535 et seq., the said deed reciting a cash consideration of $5,600.

"5.  The plaintiff next offered and read in evidence an original warranty deed from W. H. Fowler and wife to Mrs. Melvina Hitt, to 2½ acres of land, being part of the land in controversy and described in plaintiff's petition, the said deed bearing date April 10, 1906, and duly acknowledged for record and duly recorded in Vol. 66, p. 346, of the deed records of Milam County, Texas.

"6.  The plaintiffs next offered and read in evidence an original general warranty deed from Mrs. Hattie Williams to M. M. Hitt and wife to 2½ acres of land, part of the land in controversy and described in plaintiff's petition, the same bearing date Nov. 7, 1905, and duly acknowledged for record and duly recorded in Vol. 78, p. 235 of the deed records of Milam County, Texas.

"Plaintiff next offered the testimony of the witness Mrs. Melvina Hitt, who after being duly sworn on oath testified as follows:  My name is Mrs. Melvina Hitt, and I live in Cameron, Texas, at present.

My husband's name is W. N. Hitt. I knew W. J. Robertson in his lifetime. He was my husband and was commonly known as Bee Robertson. I remember the circumstances of Mr. Robertson buying the tract of land from T. C. Fowler and wife, described in the deed just read in evidence. He bought the land in 1885. I was married to W. J. Robertson, February 22, 1869, and lived with him all his life as his wife up to his death, and the date of his death was May 11, 1900, having lived with him as his wife for a period of about 31 years continuously. I remember the circumstance of him buying the land from Fowler, and we moved on it and took possession of it after the purchase. After we bought the land Mr. Robertson went down and took possession and made a crop on it and I continued to live in Davilla for something over a year after that before I moved down with him on the place. No one ever disputed our right to the place or our possession of it from the time we bought it in 1885 until about the time of the institution of this suit. We lived upon the place and raised our family there and made crops on it and we claimed it and paid the taxes on it during the entire time until I sold it, and we lived there 12 or 13 years and then Mr. Robertson bought a place known as the Hennington place, about 3 miles from this Fowler place, situated in a westwardly direction towards Davilla from our place. This Fowler tract of land is the same tract of land we sold to Mr. Hefley, and it is the same land involved in this suit, and we were in the exclusive possession of it all the time from the time of the purchase until that sale, and no one ever disputed our right or title to it, and at the time of the sale to Mr. W. T. Hefley, we delivered possession of the same to him.

"Cross examined: The description of the land given in the deed is the land sold to Mr. Hefley, but I could not undertake to give the field notes. I was married to Bee Robertson in 1869, and lived with him continuously as his wife until his death, which occurred on May 11, 1900. At the time of Mr. Robertson's death he was ailing for some time. He had been confined to his bed from the month of October preceding, and at times prior to the time he was taken to his bed, he had suffered considerably. I think the trouble with him was a cancer. He did not have Bright's disease. For 19 months prior to his death he had been considerably under the weather as to his health. I think he had had catarrh of the head for about ten years, but had gotten better of it and it was not troubling him at the time of his death. It had not been troubling him for a year or two. We were living at Davilla just before and at the time we purchased the Fowler place and moved from Davilla to that place shortly after the purchase. At the time of his death we were not living on the Fowler place. We had been from the Fowler place about three years at the time of his death. Mr. Robertson had sustained an injury in a runaway in Davilla and gotten hurt, but had recovered from that, and I suppose it was about three months after that injury before he could turn his head, but after that he entirely recovered from that trouble. The place we bought and moved to from the Fowler place was known as the Hennington place and consisted of eighty-eight acres. I sold this place to Hennington after my husband's death

and my children that were then living joined with me in the deed. My husband continued to farm on the Fowler place after moving to the Hennington place, and we rented some of it out, that is, he himself sowed one small grain crop and the balance of it he rented to tenants. Mr. Robertson and myself had three children, the oldest was a boy named Willis, the next was a boy named Charles, both of these boys were married men at the time of their father's death. Willis was married two or three years before his father's death and had one child, and Willis married Ida Robertson, Charles married on the 8th day of November prior to his father's death in May, and his wife is one of the defendants in this suit, being Mrs. Etta Robertson. After Willis married he lived in several different places, sometimes on the farm and sometimes in Davilla. He was living on the farm at the time of his father's death, that is, the Fowler place, the one I sold to Mr. Hefley. Willis had three children, all boys, the oldest is named Wilton Lee and he is ten years old, the next one is named Washington Prentiss and is about eight years old, and the third is named Charles Galloway, and is now about four years old. Willis died on the 1st day of May, 1904, and Charles died on the 4th day of October, 1900, about six or eight months after my husband's death. He died on the Hennington place. He was farming down on the Fowler place at the time of his death, but was living with me on the Hennington place and also had some crop there. He left a widow surviving him whose name is Etta Robertson, but left no children. One of my children was a girl who is now Mrs. Joslain, one of the defendants in this case. She is a widow and had three children and she and her children are now living with me in Cameron. When I made the trade with Mr. Hefley, part of the consideration was paid me in property here in town and part of it in money. I got two brick buildings from him in the trade. Mrs. Etta Robertson has been living with me ever since her marriage to my son. She has no children. My present husband's name is W. N. Hitt.

(Plaintiffs rest.)

Defendants offered in evidence:

"J. C. Gibson, a witness for defendant, being duly sworn on oath, testified as follows: My name is J. C. Gibson and I live two miles this side of Davilla. I lived in that community five or six years prior to 1900, then moved to Burnett County and came back there two years ago. I was living in that community where Bee Robertson died and had known about him about four or five years at the time of his death. I know the place he lived on near the river known as the Fowler place, and I also knew a man in that community by the name of Henry Cox. This man Henry Cox lived near Bee Robertson and rented some land from him. I think he rented the land from Mr. Robertson in 1898, and this man Cox and Bee Robertson had some dispute or disagreement along in the spring before Mr. Robertson was taken sick and confined to his bed in the fall; he was sick along about the time he had the trouble with Cox and could not cultivate his place and rented some of it to Cox and they had some trouble. Mr. Robertson came to me about the trouble he was

having with Cox and said that Cox was going to sue him for slander and that he was going to kill Cox. I advised Robertson not to kill Cox but to go and make a deed over to his son to prevent Cox from getting judgment against him for slander. Cox was threatening to sue Bee Robertson for slander because Robertson had called him a thief. Robertson came and told me that he thought he would get a gun and kill Cox, and I advised him not to do it, but to make a deed to his son to prevent Cox from getting anything, and Robertson said I will do that and came back and said to me that he had made it to Melvina and that it will keep Cox from getting the slander out of him, that is, any of the property. He did not state to me right then what effect that would have on the property, but after that he said something about giving the children certain land, and went on and stated where the land was. He said he would give the place at the bridge to B. Joslain, Willis the old place and Charles down in the field next to the creek. At the time he first called on me he was excited. He sent me to Mr. Cox and told me to give a cow and calf and Cox told me to get out of his yard and that he would not get any compromise. I went to see Cox and failed to get a compromise and came back and reported it to Robertson, and I talked to Mr. Robertson about it after I returned. He was then at my house. At that time I told him that he could put his property out of the way by deeding it to Willis. I don't know whether it was that day or the next evening that he told me that he had deeded it to Melvina, but it was one or the other. He went to John Crunk at Davilla to make the deed. So far as I know after the deed was made to Mrs. Robertson the place was carried on as he had always carried it on. I did not observe any change in the manner of conducting the place. The time that I had that conversation with Mr. Cox and Robertson in reference to the matter was along in the latter part of May or sometime in June, 1898, and it was about that time that he told me that he had deeded the property to Melvina.

"Cross-examined: I was not Bee Robertson's lawyer, I was his neighbor, and the reason why I told him to convey his land to his oldest son so Cox could not get it was because I had seen something similar like that done. He had called Cox a thief, and my advice to him was to convey his land to his oldest son so Cox could not get it, and he told me that he would do it, but afterwards told me that he had conveyed it to his wife so Cox could not get it, and stated to me that that was his purpose to keep Cox from getting it because he had called Cox a thief and that Cox was going to sue him for slander.

"J. C. Hardy, witness for defendant, being duly sworn, testified as follows: My name is J. C. Hardy. I live in Milam County, Texas, south of where Bee Robertson used to live, and I knew him in his life time and I knew his son Willis and I rented land from Willis one year, that is, in 1901. The land I rented from him was on the Bee Robertson homestead tract or the Fowler place. The part I rented from him was on the south end of the farm. It was on the south end of the field, the land nearest the house. It seems

to me like about twenty acres I rented. I never went on it, he planted it for me and he cut the oats and kept the rent himself.

"Cross examination: This was in 1901, after Bee Robertson's death. Mrs. Robertson was living on the place at the time. I did not go on the place. I never went on the place but one time and that was after the oats came up. Willis was working for me for wages and worked the land himself and I think it was about twenty acres, and all I know about the rent was that it was kept out when he cut the oats. Of my own knowledge I do not know who took the rent on it. All that I know about it is that he was hired to me and I rented the land from him and he worked and planted the oats and when they were cut he brought me part of them.

"R. D. Alexander, a witness for defendant, being duly sworn testified as follows: I live near Baxter in Bell County, Texas, and I knew Bee Robertson in his life time and also his son Willis Robertson. I think I rented from Willis Robertson in the year 1904. The land I rented was in cultivation. I rented the land on the third and fourth, that is one-third of the cotton and one-fourth of the corn and rented it from Willis Robertson. I went to him to rent it and paid the rent to Mrs. Ida Robertson his wife after his death. I do not know how long he had been farming that side of the place.

"Cross examined: I do not know how many acres was in cultivation in that field. There was as much as fifty acres. I had thirty-five acres but did not have all that was in the field. Judging from the looks of the field I assumed there was three times as much in the field as I had. Mrs. Hitt was then living on the place. She was not Mrs. Hitt then, but Mrs. Bee Robertson. She married after I left the place.

"Ida L. Robertson, one of the defendants, being duly sworn on oath, testified as follows: I am one of the defendants in this case and I live four miles east of Davilla and am now a widow. My husband's name was Willis K. Robertson. At the time of his death he lived down on the farm near the river and was the Fowler place and the one that Mrs. Hitt afterwards conveyed to Hefley. My husband and I lived there most of the time after we were married and we married in 1896. When we first moved down there, Mr. Bee Robertson, my husband's father and his family were living at the Hennington place. Mrs. Hitt and family were living on the Fowler place near us at the time of my husband's death. My husband and myself and family were living in one of the houses on the farm. At the time we moved on the farm Bee Robertson gave my husband twenty-five acres of land below the ditch. There was a ditch running through the farm. After the death of Bee Robertson there was an exchange made. Mrs. Hitt wanted to exchange land and give him thirty-five acres of land near the gate because she wanted the twenty-five acres of land to go with the house next to the river, and he made the exchange of this twenty-five acres that Willis' father had gave him. He did not put any improvements on it, just worked it himself and he continued in possession of it up to the time he died. In 1900 they made the exchange of the twenty-five acres for the thirty-five acres. He was in possession of the thirty-five acres

afterwards continuously up to the time of his death. I remember about the time Mr. Bee Robertson is said to have made the deed to his wife. This was after Mr. Robertson had give the twenty-five acres to Willis. I did not know about the making of the deed at the time, but afterwards it was generally known. The deed was placed to record about the 17th day of June. Mrs. Robertson came by our house to have it put of record. This is how I know about it. He told me and my husband that he was going to do so. He came to our house in his everyday clothes. He came to our house and then dressed up and the reason he came to our house in his everyday clothes was to keep Mr. Cox from suspecting he was coming. He did not want Cox to know that, because Cox was going to sue him for slander. He stated that the reason he came in his everyday clothes was that he did not want Cox to know. He changed clothes at our house and left and that evening he came back and changed his clothes again. After having changed his clothes he told us that he had been to Cameron. He stated that his object in making the deed was to keep Mr. Cox from getting his property. After he made this deed he continued to manage the property, just like he always had, as far as I know and at the time he came to our house and changed his clothes as before stated, he was then living at the Hennington place, and this was about four miles west of where we were living on the Fowler place. He did not come by Cox's house and come to our house because Cox lived beyond him. He came down the big road and when he got to our house it was early in the morning. After Bee Robertson's death my husband farmed the land himself or rented it out. Part of it he worked and part of it he rented out. Mr. Bee Robertson died in 1900 and Mrs. Robertson married Mr. Hitt in 1905 and they made the trade with Mr. Hefley in January, 1907. I did not sign the deed. They did not ask me themselves to sign the deed. My husband and I had three children. Their names were Wilton Lee, Washington Prentiss and Charles Galloway.

"Cross examination: The land that Willis worked was in cultivation. Willis did not pay any taxes on it that I know of. I have never paid any. I offered to, but Mrs. Hitt would not let me. This thirty-five acres that Willis cultivated was in the large field and was never fenced off separately. There was never any house built on it, but Mrs. Hitt bought a house and gave it to Wills, but this house was not put on the thirty-five acres, but was up near the residence of Mrs. Hitt. I expect it was three hundred yards from the land. Part of the time Willis lived in this house and part of the time he lived at Davilla. When Willis rented the place out, he did not stay on it and when he rented it he was not there. I expect this house was about a quarter of a mile from the thirty-five acre tract. I obtained a certified copy of the deed from Bee Robertson to Mrs. Hitt about two years ago, but it is not from that deed that I remember the date of Mr. Robertson's coming by our house and changing his clothes. At the time Willis and I moved on the Fowler place, Bee Robertson was living on the Hennington place. When Mr. Bee Robertson bought the Hennington place, he built a good house on it

and dug a well and settled himself there and put up a barn and walled up the well and lived there on the Hennington place. Bee Robertson had another tract of one hundred and six acres and he gave that to Mrs. Joslain. Bee Robertson told me that he was coming down to Cameron to put that deed on record and said that he was afraid that Cox would get a judgment against him. He said that Cox was going to sue him for calling him a thief. Bee Robertson did not keep his Sunday clothes at our house, but brought them along with him in a flour sack. When he came back from town he took them off and put them in the flour sack and carried them home."

*Opinion*:—Appellants' brief contains four assignments of errors, which are as follows:

"1. The court erred in admitting in evidence deed from T. C. and A. E. Fowler to W. J. Robertson, as shown by bill of exceptions No. 1.

"2. The court erred in excluding the testimony of witness Mrs. Ida L. Robertson, as shown by defendant's bill of exceptions No. 3.

"3. The court erred in giving peremptory instruction to find for the plaintiff; because it appears from the evidence that the property in controversy was the homestead of W. J. Robertson and his wife Mrs. Malvina Robertson and the pretended deed from W. J. Robertson to his wife through which plaintiff claims title was void, because the same was not executed by the husband and the wife with the formalities and requirements of the Constitution of the State, relating to conveyances of the homestead.

"4. The court erred in peremptorily instructing the jury to find for the plaintiff, because it appears from the evidence that the deed by W. J. Robertson to his wife Malvina Robertson for the land in controversy, through which plaintiff claims title was not intended and did not in fact operate to convey the title to said land; but was merely a simulated transfer and there was no change in the ownership, control or possession of said land during the life of said W. J. Robertson; but same remained in his possession until his death and he exercised all the rights of ownership over the same, just as he had previously done and the purpose of said conveyance was merely to pretend and not in fact to convey the title, and at the time of his death said property was the community property of said W. J. Robertson and his said wife and one-half descended to his children through whom defendants claim and they are entitled to one-half thereof."

These assignments will be disposed of in the order named, and our conclusions of fact on the evidence will be indicated in disposing of them.

1. In view of the undisputed evidence in the record and the admission of the appellants made in their brief that J. W. Robertson was common source of title, there could be no error in the action of the court in admitting the deed from Fowler to Robertson, as complained of in the first assignment of error, although that deed was not properly acknowledged. If Robertson was common source of title, there was no necessity for either of the parties to go back of

him, and there is a distinct admission in appellants' brief that such was the case.

2.   There was no error in the action of the trial court in not admitting the testimony of Mrs. Ida Robertson. If it could be held that that evidence was admissible, it certainly could not have affected the result.   If admissible at all, it would be merely upon the question that W. T. Hefley, the vendor of the plaintiffs, had notice or knowledge of the fact that Mrs. Ida L. Robertson was asserting some claim to the land.   The proposed evidence is to the effect that it was expected to be proved by Mrs. Ida Robertson that Hefley endeavored to get Mrs. Robertson to execute a deed to the land, which she refused to do.   While it is insisted by appellee that the plaintiff ought to be protected as an innocent purchaser, we in disposing of the case, lay no stress upon that issue.   It is true that he held the legal title, and it appears that he paid a valuable consideration for the property, and the defendants, asserting an equitable title, would rest under the burden of proving facts tending to show that the holder of the legal title acquired it with knowledge or notice of their rights. But, as said before, we have pretermitted this question, because it is not necessary to be decided, and for the further fact that there is some evidence in the record showing that some of the appellants were in possession of the land at the time that the Hefleys purchased; consequently, the question might arise whether such possession was not sufficient to charge the plaintiff and his vendor with notice of whatever right the appellants may be able to assert.

3.   There is evidence both ways as to the question whether the property was occupied as a homestead when the deed from W. J. Robertson to his wife Malvina was executed in June, 1898.   There is evidence to the effect that it was then so occupied and used.   On the other hand, Mrs. Hitt, formerly Mrs. Robertson, testified in effect that she and her husband lived on the place twelve or thirteen years after they bought it in 1885; and again, that her husband died on May 11, 1900, and that at that time they had been away from the Fowler place, the one in controversy, three years, they in the meantime occupying as their homestead another farm, known as the Hennington place.   Of course, if she is correct as to the time stated, the place in controversy was not the homestead when the deed to her was executed in 1898; and if that was the case, the conveyance by the husband was sufficient to convey title without her joining in it. But, if we should conclude that it was homestead when the deed was executed, the result is the same, for it is clearly and beyond question shown by the evidence that she and her husband abandoned the premises in controversy, and established their homestead on another place known as the Hennington place, and this was the condition of affairs when the husband died.   She had not asserted since the abandonment of the premises a homestead right in it, and, so far as shown, she assented to the change.   On the facts this case is stronger in favor of the conveyance than the one before the court in Marler v. Handy, 88 Texas, 422.   That was a deed by the husband, Marler, to Handy of the homestead, which was community property.   The wife refused to join in the deed and always claimed her homestead

right in the property, but shortly after the conveyance by the husband they moved from the premises and acquired a place elsewhere and there the husband and wife established their homestead. The Supreme Court, after discussing a number of cases, said:

"From these authorities, and we believe upon sound principle, the rule may be stated, that the husband, acting in good faith, may select the homestead of the family; and that when he has acquired a new home and his wife has removed with him to the newly acquired homestead, a deed made by him without her concurrence, to the former homestead, becomes operative as to the husband as an estoppel against his right to recover the property. The wife's right being that of homestead only, ceases when a new homestead has been acquired and she removes thereto. The deed made by Marler to Handy was not void under our Constitution; and although inoperative as long as the property was occupied by him and his wife as a home, yet when he and his family removed therefrom to another homestead, he acting in good faith for the best interests of himself and his family, the deed became operative to vest title in Handy, and the property could not be recovered by the husband, because he would be estopped by the deed, and it could not be recovered by the wife because her homestead right ceased when her husband acquired and she removed with him to another homestead."

There is no question raised in this case but that the husband was acting in good faith in abandoning the old homestead and acquiring a new, and we can see no reason why the principle announced in Marler v. Handy should not apply in affording protection to a conveyance from the husband to the wife, as it would from the husband to a stranger.

4. The deed in question from her husband vesting in Mrs. Malvina Robertson the legal title, and the evidence of the plaintiff throwing no suspicion upon the same, the burden was upon the appellants to introduce evidence of some probative force showing either that she held the legal title in trust, or that it was a simulated transaction as between the parties to it, and that as between them it was not intended that it should be effective as a conveyance. If the evidence in the record is of no force in establishing these issues, the trial court properly instructed a verdict for the plaintiff. Appellants in their brief make no point that the deed from Robertson to his wife was not delivered, but however, what evidence there is upon this subject tends to show a delivery. As having some bearing on the question that the purpose was not to convey title and that the transaction was simulated, appellants lay some stress upon the fact that after the execution of the deed Robertson, the grantor, remained in possession. Little if any force can be given to this fact, because the grantor and grantee were husband and wife, were living together as such, and in such a case their occupancy of the premises is entirely consistent with the rights of the wife who is asserting title under a deed from the husband.

There is no direct charge made in appellants' brief that the deed was not supported by a consideration, and there is nothing upon this subject except the inference that arises from the evidence offered by

the appellants tending to show what they term a simulated transaction, and from what appears from a recital contained in the deed indicating a consideration, which is "In consideration of $5 and other valuable considerations paid by the grantee." As between the parties to a conveyance the recital contained in it as to the consideration is evidence, and when not explained or contradicted, should be given some effect; and in such a case, if a consideration could be held necessary to support an executed conveyance, the recital should be deemed sufficient if it recites a fact sufficient in law to create either a good or a valuable consideration. The deed we are considering was executed, and it appears from its face, as well as we are able to determine from the meager facts stated, to be based upon a valuable consideration. Besides, the consideration of love and affection as between husband and wife is sufficient. Furthermore, in determining the legal effect of an executed conveyance, in the absence of evidence to the contrary, the law will imply a consideration; and this may be said to be the rule applied to all written contracts which have been executed and acted upon, and when there is no issue of fact made by the evidence upon this question, the court construing the instrument should treat it as based upon a sufficient consideration. But, aside from all this, is a consideration necessary in order to support a deed or conveyance that is fully executed and delivered? The weight of authority answers this question in the negative, and it has been recently so held by this court, but at present I am not able to recall the decision that so decides; but in Baker v. Westcott, 73 Texas, 129, this principle is recognized. There it is said, "That a consideration is not necessary to the validity of a deed conveying land has been held in the courts of many States. Ruth v. Ford, 9 Kan., 17; Perry v. Price, 1 Mo., 664; Doe v. Hurd, 7 Black., Ind., 510; Green v. Thomas, 11 Me., 318; Marshall v. Fisk, 6 Mass., 24. If the instrument in this case was a mere executory contract, the rule of equity would probably require proof of consideration in order to enforce it, although this is ordinarily presumed from the use of a seal. But we think this instrument in effect a deed which conveyed the legal title to Westcott. If it were competent at any time for the grantor or his heirs to avoid it for want of a consideration, this could only be done by affirmative proof of the fact that the conveyance was purely voluntary."

The deed importing a consideration and vesting the apparent legal title in the vendee, the appellants, if they expected any benefit from the fact that no consideration existed, should have offered some evidence to that effect, which was not done, except as before said the mere inference that arises from the statement of the grantor that he conveyed the land to his wife in order to defeat the claim of Cox. Mrs. Robertson, the only other surviving party to this transaction, says nothing about it, although she testified as a witness in the case. This much is said upon this subject merely to anticipate a contention that a consideration was necessary, and we do not desire to be understood as holding that a want or absence of consideration could not be shown and considered in determining the main

question whether the parties to the deed intended it as a simulated transaction, which question we will now dispose of.

All of the evidence upon this subject, reduced to a concise statement, is the fact that Robertson was advised to execute a conveyance in order to defeat the collection of a supposed claim of Cox for slander, and his statement to the effect that with that purpose in view he had conveyed by deed, the land in controversy to his wife. Mrs. Robertson testified, but said nothing about the purpose and object of the deed and the consideration, but her evidence shows that she acted upon the deed as conveying title to her and so treated it. If there was any agreement or understanding between the husband and wife to reconvey, or upon her part to hold in trust, or any recognition of the fact that the deed was a simulated transaction and was not to be given the effect that the law implies from the words of conveyance in which it is framed, it was not shown by the evidence. In all the cases upon this subject where the deed was avoided by the vendor some fact of this character was shown, and we have found no instance in which, between vendor and vendee, an executed conveyance has been canceled or voided, or the legal title thereby created has been charged with a trust merely upon the evidence of the grantor that he did not intend to convey. But the declarations of the grantor in this instance do not go this far, for he merely says that he had conveyed the property to his wife for the purpose of putting it beyond the reach of Cox. That may really have been his purpose, but it by no means follows from this that the parties to the transaction regarded it as simulated, and intended that the conveyance, as between them, should not take effect, or that the vendee should hold the legal title in trust for the vendor. While Robertson may have intended to defeat a collection of the claim of Cox, he may also have intended to convey title to his wife, which purpose would have comported with the legal effect of the deed and his act in having the same recorded, and the fact that during the remainder of his life he never indicated a purpose to recall the deed or question the full and complete title which by its terms it purports to convey to the wife. She was the natural object of his bounty, and as between them no suspicion is imposed upon the deed that it does not reveal the truth and was not intended, as between them, to pass title, merely upon evidence that the vendor in executing it intended thereby to defeat a supposed claim of some third party. As between the parties to an executed conveyance, proof merely of this fact was not sufficient. The evidence should have gone further in establishing additional facts, which in this case were not shown. Such facts, for instance, as are indicated by the cases of Taylor v. Ferguson, 87 Texas, 2, and Rivera v. White, 94 Texas, 539. These cases and others of like kind, upon the facts, are in no wise similar to this case, for in all of them the evidence tended to show an agreement to reconvey or a holding by the vendee in trust or in recognition of a superior right in the vendor.

This discussion of this phase of the case is sufficient to indicate our views that the trial court was justified, under the evidence, in treating the deed as passing title, and the evidence assailing it was

not sufficient to overcome it; but there is another view of the case which may have influenced the trial court in directing a verdict, which can be based upon the facts of the case and the law as thereto applied as molded by the decisions. When the debtor conveys with the purpose of defrauding his creditors the conveyance, though voidable as to the latter, is conclusive and binding between the former and his vendee. Rivera v. White, supra. One having a valid claim and demand for unliquidated damages may be a creditor entitled to such protection. 2 Bigelow on Frauds, p. 148; Holden v. McLaury, 60 Texas, 228; Cole v. Terrell, 71 Texas, 550, and of that class of creditors entitled to such protection are those having an action for slander is recognized by the cases of Clapp v. Leatherbee, 18 Pick., 131-8; Stevens v. Works, 81 Ind., 445; Shean v. Shay, 42 Ind., 375; Cooke v. Cooke, 43 Md., 522, and others that might be mentioned.

The conveyance before the court in Rivera v. White, supra, was executed by the husband with the view of defeating a supposed claim of the wife for alimony. There was no assertion of such a claim, nor was it shown that such a claim existed or that she was entitled thereto. The court held that it did not follow in a divorce proceeding that the wife was entitled to alimony as a matter of course, but that that right would depend upon the facts, and held that as the statute intended only to protect creditors, they must be shown to exist, and the mere fear of the vendor that some one might assert a supposed demand, would not be sufficient to show that the conveyance was in fraud of creditors, although his intent was to place the property beyond the reach of such supposed claims. In other words, that a mere intent to defeat an unreal or a fancied claim was not sufficient. But in our opinion there is a difference between the facts of that case and this. Here there is no question but that Cox had a cause of action against Robertson for slander, and all the evidence upon this point was introduced by the appellants, and the facts in evidence show a prima facie case against Robertson, and they offered and introduced no evidence to the contrary. They did not undertake to show that the charge made against Cox was true, or any other fact that would defeat his recovery. The words used by Robertson were actionable per se, and if no defense was offered, damages for some amount would follow as a matter of course. If in such a case evidence would be admissible to show that the plaintiff sustained no injury, which by the way, the case of Belo v. Fuller, 84 Texas, 452, holds to the contrary, it is sufficient answer to say that nothing of the kind was offered. Robertson had called Cox a thief and he was threatening to sue him for damages. He prevailed upon his friend Gibson to see Cox with a view of settlement or compromise. He interviewed Cox and was unsuccessful. Thereafter Robertson executed to his wife the deed in question with the expressed and avowed intention to defeat a collection of the claim of Cox, a demand which the evidence shows Robertson recognized existed, and which the evidence tends to show was asserted by Cox. The evidence is silent upon the question as to whether Cox instituted against Robertson an action of slander, but if he failed to do so, such fact would not affect

the nature and effect of the transaction resulting in the conveyance, if the purpose was to defeat a real and meritorious claim.

Therefore, we think there was no error in treating the conveyance as executed by Robertson for the purpose of defrauding the creditors; and, such being the case, neither he, if living, nor his heirs who now assert under him, could attack it.

We find no error in the record and the judgment is affirmed.

*Affirmed.*