## SHAW v. GILLESPIE.    (No. 1199.)

(Court of Civil Appeals of Texas. Beaumont. March 27, 1925. Rehearing Denied April 8, 1925.)

I. Deeds ⬅️78—Evidence held to raise issue of grantor's insanity at time deeds were executed.

Evidence *held* to raise issue of grantor's insanity at time deeds were executed and delivered.

2. Evidence ⬅️383(7)—Recitals in deeds held to show prima facie that grantee had paid consideration named therein and that instruments were deeds of conveyance.

In suit to set aside deeds for grantor's insanity, recitals of consideration in deeds *held* to make a prima facie case for grantee that he had paid consideration named therein and that instruments were deeds of conveyance.

3. Insane persons ⬅️98—Grantee held to have burden of showing that money paid insane grantor for deeds was properly expended.

Grantee, before being entitled to a return of consideration paid insane grantor for deeds, had burden of showing that money was ex-

pended for necessaries, or that it was on hand at grantor's death or had been invested by or for benefit of his estate.

4. Insane persons ⬅️66—Grantee held not entitled to return of consideration paid insane grantor for deeds.

In suit to set aside deeds for grantor's insanity, grantee *held* not entitled to a return of consideration paid, in absence of proof that money was expended for necessaries, or that it was on hand at grantor's death, or had been invested by or for benefit of his estate.

Error from District Court, Newton County; V. H. Stark, Judge.

Suit by E. J. Gillespie, administrator of the estate of A. A. Hardy, against A. L. Shaw. Decree for plaintiff, and defendant brings error. Affirmed.

A. L. Shaw, of Beaumont, and W. E. Gray, of Wiergate, for plaintiff in error.

Jas. A. Harrison, of Beaumont, and J. B. Forse, of Newton, for defendant in error.

WALKER, J. In 1917, plaintiff in error, A. L. Shaw, took a deed from A. A. Hardy to certain property in the town of Newton, Newton county, Tex. This deed recited a consideration of $2,500 for the property, $1,000 of which was paid in cash, and the balance in vendor's lien notes. Afterwards, on the 28th day of March, 1918, A. A. Hardy executed to Mr. Shaw a release against these notes, reciting in the release that he had received from Mr. Shaw full payment therefor. On the same day, for a consideration of $100, as recited in the deed, A. A. Hardy conveyed to Mr. Shaw "all that certain tracts or parcels of land that I now have and own in Newton county, Tex., and being the same property that I inherited from my parents and brother, each now deceased, as well as all the real property I acquired title to by purchase and otherwise."

A. A. Hardy died in 1922 in the insane ward of Jefferson county. This suit was instituted by his administrator, the defendant in error herein, to cancel and set aside the conveyances from Hardy to Shaw on allegations that Hardy was insane at the time he executed them, that Mr. Shaw was the attorney for Mr. Hardy at that time, and the deeds, in fact, were executed only for the purpose of putting the title in Mr. Shaw to be held in trust for Mr. Hardy, and that no consideration was, in fact, paid for the deeds. The petition was not sworn to. Mr. Shaw answered by demurrers, general denial, etc. On a trial to the court without a jury, a general judgment in favor of appellee was rendered, without conclusions of fact and law.

[1] Plaintiff in error urges the proposition that there was no evidence to sustain the judgment. First, he insists that there was no evidence that Hardy was insane at the time

the deeds were executed and delivered. We cannot agree with him in his construction of the evidence.

A. A. Hardy had lived most of his life in Newton county. For many years prior to 1915, he was in business in the town of Newton, a part of the time in partnership with his brother, Bill Hardy. After the dissolution of that partnership, A. A. Hardy conducted a business in his own name. About 1915, he moved from the town of Newton to Kirbyville, in Jasper county, a distance of about 20 miles. However, he did not move his business, but locked his store and left his stock of goods in Newton. In Kirbyville, he built a new store and bought a new stock of goods. He continued in business in Kirbyville until about 1918, when he failed, and a large part of his property was sold under execution. During the latter part of 1915 and a portion of 1916, his niece, Miss Earl Gillespie, was in partnership with him. The evidence showed that he was a most eccentric and very peculiar man, even from the standpoint of the evidence offered by appellant. Many of the men and boys of Kirbyville made a practical joke of him, teasing him, worrying him, and taking down his sign and rattling the door of his business house. During the last years of his life he suffered with a cancer on his face. Dr. McCreight, who was a graduate of the University of Texas, with many years' practical experience in general medicine, besides some special study in insanity cases and some little practice with insane patients, testified that he maintained an office across the street in Kirbyville from Mr. Hardy's place of business, and during the time he was in business had an opportunity to and did observe his conduct and general behavior, but never examined him professionally. He further testified:

"He had a sign up there, and he would take it down and carry it in and lock up the store, and in about 30 minutes or an hour he would bring it back. I have seen him do that often in the course of a day. And I have seen him get his grip and close up, and most any time of the day go down to the train as though he was going off on a train, and it wouldn't be train time at all. And I have seen him in the early morning or on a clear moonlight night carrying a parasol over his head as if he thought it was raining. Yes, sir; I have seen him pulling his whiskers. He would do that all the time—picking at his nose and pulling his whiskers.

"Q. Now, assuming, in addition to that, that a man had a store here in this county and a stock of goods here, and he moves to Kirbyville and just locked up the store with the goods here and left it locked for several years —two or three years in that condition—and opened up another store at Kirbyville; and assuming that he would not eat with anybody, but had to have his own knife and fork and plate, and wouldn't sit at the table with anybody; and assuming further that when he went to church he would not sit with anybody,

but carried his own stool with him, and sat on that; and assuming further that he did those things you say you observed him do— then as a hypothetical question and on that basis would you say the man was sane or insane? A. I think that taking all those things into consideration—I would not say that he was insane for locking his store up—but for all those things you mentioned, I think he is necessarily unbalanced."

On cross-examination, this witness said:

"Well, the actions and things that he would do is the way I formed my opinion of his insanity."

The witness Henry Fuller, after stating that he had seen him stand up before a looking glass "pulling all his whiskers out and taking pinchers in his fingers and pulling his whiskers out," further testified:

"And then he would walk about at night with his umbrella stretched over him with the moon shining, and in the day, any time, he would walk out with his umbrella stretched over him. "Yes, he had a store here. In 1917, I think his store was closed up about then. The first store he had, he just locked it up with his goods in there, goods and groceries, and wouldn't go in there at all and wouldn't let anybody in there, and he didn't go in there. I never did see him in there. After he built a new store, he never did go back in that one as far as I ever saw. He never did open it any more that I ever seen, and the goods and groceries were all locked up. I suppose the store was closed and the door locked; I never examined the door. He left it in that condition a good while. I do not know how long it was in that condition. That store must have stayed closed there for three or four years.

"Sometimes he wouldn't sell to nobody. Sometimes he would sell to people. I went in there once or twice to ask him for some things, and one time I went to get a hat, and he set the hat down on the counter, and directly he said: 'You fellows go on home, I'll see you some other time,' and he walked out and we walked out.

"Q. Now, from those acts and from the observation you made of him during the time you intimately knew him, would you say he was sane or insane in 1917 and 1918? A. Well, the last I knew of him, he wasn't a sane man; he was insane. He wasn't of a sound mind; he didn't have a sound mind. The last time I seen him was in Kirbyville. I seen him one time after that. No, sir; I do not remember what year that was. I was passing through there, and I got Bill Holland to go with me to his store. I suppose he had been in Kirbyville a year or a year and a half, or maybe two years. I do not remember the year he left this town."

J. W. Beeler, cashier of a bank at Kirbyville, said:

"My opinion was just based on observation of his daily acts. Well, those acts, one thing more than another, he had a habit of leaving his store closed up during the day, and when a person would go there to get admission, he

would let them in and lock the door. He would frequently do that, and he had a sign over his door, A. A. Hardy, and he had a stepladder, and he would frequently take that down three or four times a day and carry it in the store and set it down and lock up the store. And one morning I was going over here on Cow creek fishing or hunting, and it would be about 3 o'clock in the morning when we drove up there, and he had his store opened up and all lighted up ready for business. And another thing, he always carried his umbrella at night. He carried that umbrella opened. Yes, sir; rain or shine, it didn't make any difference, he would carry his umbrella open. I lived between where he boarded and his place of business, and he passed right by my gate. I don't recall that I saw him going around with a grip in his hand, but I do recall that he would frequently close up his store and go out down the street with his umbrella, and go around the corner and come back again back of the store and go in. I expect I have seen him do that nearly a hundred times—just go around one block and come in through the alley and go in the back door. He would come to the corner where the bank is, and I could see him go down the street south and turn the corner.

"Q. Now, from the facts you have, stated, state to the court, in your opinion, was he sane or insane? A. My opinion is that the old gentleman was badly unbalanced."

M. Singletary testified that he lived in Kirbyville, and had lived there 16 years, was in the livery business for 12 years, knew A. A. Hardy about 35 years, but did not see him very frequently before he moved to Kirbyville; saw him every day afterwards and observed him every day. He further testified:

"The first time I paid any attention to him for a long time was his niece brought him down there from Newton. He had been sick up here, and he got off the train at Call. He had a big sore on the side of his head. I carried him over to Kirbyville, and in a few days he sent word for me to bring him over to Newton, and I sent my oldest boy and he brought him over here, and stayed about 10 or 15 minutes and went back to Kirbyville, and a few days later he come after me to bring him back, and I sent the second boy, and he started to Newton with him and got out two miles, and then he made him turn around and go back to Kirbyville; and then he made him turn around and go back towards Newton again, and he got out this side of the bridge and turned him around the third time; and then the boy hunted me up and said, 'You will have to take this old fellow and do something with him, he's crazy,' so I told him to get out as the car was out of fix, and he said, 'Well, you will come back and get me after a while,' and I told him, 'Yes, I guess so.' And then I left him, and I did not have anything further to do with him, and he come after me every day or two to bring him to Newton, and I refused to do it. He would go around after night with his umbrella over him, and he would do business there with his door closed, and he wouldn't let anybody in except a nigger or somebody who wanted in there; and kids used to go to his door and shove it open, and they deviled him to death there for the last two or three years—my boys and all the other boys in town. Every time he would come out they would yell at him. Yes, sir; they ridiculed him because he kind of resented them and did not want them in his store. Yes, he would take his sign down and take it into the house and keep it a day or two and then hang it back up. Yes, I have seen him carrying a grip, walking around with a grip and an umbrella in the street. I believe, from the acts and conduct which I have just related to the court, that he was of unsound mind. Yes, sir; I don't believe he was of a sound mind."

Harrison Hall testified that he was county attorney of Newton county; knew Hardy in his lifetime; knew him about 35 years; had talked to and observed him. He further testified:

"The things that I observed that caused me to form my opinion, well, he was here at a store right over on the corner, and one time in particular I came down here, during the time that Judge Denman was county judge, and he was walking the ground floor hollering, 'Oh, Lordy, save me,' and I thought from the way he acted there was somebody dead, and I went over there to him, and about the time I got near him I spoke to him, and when I spoke to him he said, 'Good morning,' and Judge Denman walked up at that time and talked to him a little bit; and I asked him if anybody was hurt, and he said there was nothing, and he ceased just for a minute, and we walked off, and he began it again and went on a number of times. Now, a number of times I have seen him walking at night. I have seen him on a clear bright night walking around with an umbrella over him, open. And another time I have seen him start like he was going into the hotel down there to get his meals, and he would be walking along, and all of a sudden he would stop and wheel, and walk back for some distance, and then he would go to the hotel. And then, I have seen him coming to the post office over here, and he would come from the hotel up to the post office and turn and go clear back around in front of his store. And I have been out at night late, and I have passed his store and heard him in there, and sometimes it would be dark, and he was standing there dancing and jigging, you might say, right in the dark. One occasion I have seen him in there, and I wanted to buy something I couldn't get anywhere else in town, and he said: 'I am too busy. I haven't time to wait on you. You call to-morrow. I'll wait on you to-morrow.' He was just sitting down and walking the floor. Before that when he had this new building he had a little old store, and he rolled the old store back, and I asked him about buying it. I tried to buy that stock of goods from him, and went over and talked to him about it. I said, 'Abe, there's a lot of good goods up there,' and he refused to let me even look in the house, and I said, 'Why don't you bring it up in front then?' and he said that wouldn't do, and then he closed his store. And I have been in his store several times and he asked me to come back when he would have time. Now the last time I saw him was in Kirbyville when I walked in the store, and he began to fix like he was going

to close, and he said he had some business and asked me to get out of the store. Yes, we had been friends. I had never had any trouble with him.

"Q. Now, basing your opinion on the facts you have detailed, there, in your opinion was he sane or insane? A. I think he was insane; that was my opinion."

Miss Earl Gillespie, Mr. Hardy's niece and partner, testified:

"I was closely identified with my uncle, in business. Yes, sir; I formed an opinion as to his being sane or insane. It was from the way he acted. He would take on, and hold his hands and say, 'Lord, have mercy on me; what am I going to do?' And he would say, 'Earl, don't you see those men over there in that bunch down there, they are doing to lock me up before night,' and 'he would pull his sideburns all out, and have it grow again. Yes, sir; that was frequent. He walked up and down the street with sticks in his hand, and he would take the sticks to the toilet with him. About his peculiarities about selling merchandise, well, it is just this way, if he took a notion not to sell a certain thing, well, he wouldn't do it. It didn't make no difference what it was; if anybody come in there and they wanted it, and if he didn't want it sold, he would say just leave it alone; and there was one man come in there and wanted to buy a shirt, and he told him, no, he didn't want to break his stock. That was one time he said that. In my opinion he was absolutely insane."

Mr. S. B. Conn, a banker in Kirbyville, testified:

"I knew A. A. Hardy in his lifetime. Well, I have known him intimately since 1915, when he moved to Kirbyville. After coming to Kirbyville, I would probably see him every day that I was in Kirbyville. I spoke to him occasionally. I observed his actions. During the period he was in Kirbyville was about four or five years. He would put on his hat and take his umbrella and stretch it and walk down the street at 8 or 9 o'clock of the night, I have seen him do that, and that was peculiar of him. That was one of the things I observed about him. And then after she left him he would close up his store in business hours, and lock himself up in the store, in his place of business, and if any one went in there and knocked on the door, he would let them in and turn the lock on them and lock them up in there; and I observed that more especially among the nigger class of people. Then a few times I have left Kirbyville early in the morning, at 4 or 5 o'clock—before sunrise—and he would have his store open and a light burning in the store. And those were the main peculiar things I observed about him. A few times when his business was in bad shape and I saw him about a draft, he would tell me he had sent a check, or would send me a check, and probably in a few days he would write me about the draft and return it and ask why I had sent it. He was always very nice and courteous to me when I would go in to present him with one of those drafts to pay. I have seen him take his sign down and take it inside, but I thought perhaps the little boys in

town found out the old fellow was in bad shape and they got to teasing him, and maybe that was the cause of him taking the sign down, for fear that they would carry it off. "Q. Now, in your opinion, was he sane or insane? A. He was insane, in my opinion."

On the facts observed by her, Mrs. R. E. Wall also testified that he was insane. Without further analyzing the evidence, we believe the issue of insanity was raised.

[2] Defendant in error offered no evidence to support his allegations that the deeds were executed by Mr. Hardy without consideration, or that they were intended as trust deeds. By the recitations in the deeds, plaintiff in error made a prima facie case that he had paid the consideration recited therein, to wit, $2,500, for the deed executed in 1917, and $100 for the deed executed in 1918. Sachse v. Loeb (Tex. Civ. App.) 69 S. W. 460; Robertson v. Hefley, 55 Tex. Civ. App. 368, 118 S. W. 1166; Ralls v. Parish (Tex. Civ. App.) 151 S. W. 1091; Haldeman v. Chambers, 19 Tex. 1; Williams v. Talbot, 27 Tex. 159; Richardson v. Overleese, 17 Tex. Civ. App. 376, 44 S. W. 310; White v. Street, 67 Tex. 179, 2 S. W. 529. And that the instruments were deeds of conveyance.

In our judgment, plaintiff in error is entitled to a finding that the instruments were executed to him as conveyances for his benefit, and that he paid the consideration expressed in the deeds, to wit, $2,600, on the ground that the introduction of the instruments made a prima facie case in his behalf which was not overcome by defendant in error.

[3, 4] But we cannot sustain his proposition that he is entitled to a judgment for the amount of the money paid by him to Mr. Hardy, as a consideration for these deeds. The law of this state seems to be plain that he rested under the burden of showing that the money paid by him to A. A. Hardy was expended for necessaries, or that it was on hand at the time of Hardy's death, or that it had been invested by or for the benefit of his estate. In the absence of such proof, he was not entitled to a judgment for the consideration paid by him for the land. Brown v. Brenner (Tex. Civ. App.) 161 S. W. 14; Rowan v. Hodges (Tex. Civ. App.) 175 S. W. 847; Bullock v. Sprowls, 93 Tex. 188, 54 S. W. 661, 47 L. R. A. 326, 77 Am. St. Rep. 849; Bank v. McGinty, 29 Tex. Civ. App. 539, 69 S. W. 495; Williams v. Sapieha, 94 Tex. 430, 61 S. W. 115.

The plaintiff in error has advanced many propositions, but most of them are disposed of by what we have said. The other propositions are too general or not supported by statements from the record, and are, therefore, overruled without further discussion, but, even when considered on their merits, do not involve sound legal propositions.

The judgment of the trial court is in all things affirmed.