**SMITH et al. v. THORNHILL** (No. 1738.)*

Court of Civil Appeals of Texas. Beaumont.
Dec. 19, 1928.

Rehearing Denied Jan. 9, 1929.

next and best friend" of Minnie Lee Bovender, a widow, again'st J. F. Smith and Mrs. Parlee Smith, a widow, to cancel a note for $1,500, dated October 2, 1924, together with a deed of trust of even date with said note, given to secure its payment by Minnie Lee Bovender, in favor of Parlee Smith. For grounds of cancellation it was alleged that Minnie Lee Bovender, at the time she executed the note and deed of trust and continuously long prior.thereto, was of such unsound mind as to be utterly incapable of understanding the nature of her said acts in executing said instruments, and "since last August she has been mentally incompetent to know the nature or the legal effect of any of her acts with respect to her said estate." The petition gives in full detail the story of Miss Bovender's mental and physical troubles—some years previously she had suffered a severe "nervous breakdown"; she was silly in her conversation; her memory was defective; she was incapable of understanding what was said to her; she would forget the names and faces of her associates; her general health was bad; she was in an extremely nervous condition as a result of her approaching climacteric; certain parties had control of her person for some months prior to the execution of the instruments in question, disposing of her estate, managing it as they saw proper, to her injury; she was extremely susceptible to suggestions from her associates, etc. The petition stated the probable value of her estate, which was not large. The petition also stated that no guardian had been appointed for her person or estate, and that no action. of any kind had ever been had in probate court in regard either to her person or estate. The prayer was for cancellation of the note and deed of trust. Defendants replied by general and special demurrers and by general denial. They further answered by specially denying all of the particular facts pleaded by plaintiffs. By way of cross-action they set up the note and deed of trust pleaded by plaintiffs, and prayed for judgment thereon.

Only one question was submitted to the jury, "Did Minnie Lee Bovender have sufficient mental capacity to execute said note and deed of trust?" which was answered, "No." On this verdict judgment was entered canceling the note and mortgage and denying defendants any and all relief on their cross-action. Defendants have duly prosecuted their appeal.

█ That Minnie Lee Bovender had never been adjudged an idiot, lunatic, or a non compos mentis by the probate court, and that no guardian had been appointed for her person or estate by the probate court, did not deprive the district court of jurisdiction to.try this case. By the express provisions of article 1994 (Rev. St.), "minors, lunatics, idiots or non compos mentis who have no le-

George T. Burgess, of Dallas, for appellants.

Claude C. Westerfeld, Elihu E. Berwald, and Carter & Berwald, all of Dallas, for appellee.

WALKER, J. This suit was filed on December 10, 1924, by Sam T. Thornhill, "as

gal guardian may sue and be represented by 'next friend,'" and such "next friend shall have the same rights concerning such suits as guardians have." This statute is not in violation of section 16, article 5, of the Constitution, reading: "The county court shall have the general jurisdiction of a probate court; they shall * * * transact all business appertaining to * * * idiots, lunatics [or] persons non compos mentis." Nor does Dean v. Fuller (Tex. Civ. App.) 290 S. W. 829, cited by appellants, sustain their proposition. That case was an effort on the part of the trial court to appoint a receiver for the estate of a non compos mentis with the general powers of a guardian in probate. The Court of Civil Appeals held that the district court was without jurisdiction to enter such an order. We have no such case here, but simply a suit by next friend for specific relief. The right of a next friend to prosecute suits of this character has been many times sustained. Holzheiser v. Railway Co., 11 Tex. Civ. App. 677, 33 S. W. 887; Lindly v. Lindly, 102 Tex. 135, 113 S. W. 750; Holland v. Riggs, 53 Tex. Civ. App. 367, 116 S. W. 167; Holland v. Couts, 100 Tex. 232, 98 S. W. 236; Schneider v. Rabb (Tex. Civ. App.) 100 S. W. 163.

Appellants urged the following demurrers against the petition:

(1) There was no specific allegation that Minnie Lee Bovender was a lunatic or an idiot, the allegation being that "she was a non compos and had not sufficient mentality to understand the execution of the note and deed of trust." The point was made that this was a conclusion of the pleader and not the allegation of a fact. However, in connection with this allegation, as already stated, the appellees plead the facts upon which they relied.

(2) Appellees did not plead a tender back of the proceeds received by Minnie Lee Bovender on the note. Appellants contend that on the allegations of her petition she was, as a matter of law, entitled to no relief except upon a plea of tender and an offer to do equity.

(3) As appellants construe appellees' petition, there was no allegation that they did not deal in good faith with her in taking from her the note and deed of trust in controversy, it being their contention that an allegation to that effect was necessary in order to state a cause of action for cancellation. Their proposition, in effect, is that one dealing in good faith with a person of unsound mind is protected by law, and that the lunatic can have the rescission thereof only by tendering back the consideration received. While insisting upon this view of the law, appellants concede that they are not sustained by the Texas authorities, saying on this point: "In the outset, we admit that the law as established by the decisions in Texas appears to be that unless the evidence shows that the lunatic still had in his possession the money paid for the execution of the instrument or property acquired therewith or that the money had been expended for him or by him in the purchase of necessities, he is not required to restore; that the burden of proving these facts is upon the party claiming under the instrument; and that his act may be avoided as against an innocent purchaser without notice."

They contend that the Texas rule is against the great weight of authority, saying: "The law as announced by the courts of Texas is harsh, impedes progress, stops development and improvement and prevents investment of capital, while that sustained by the great weight of authority * * * affords ample protection to the incompetent, makes for improvement and development of properties and free sale and exchange thereof and the investment of capital therein."

The rule announced by Williams v. Sapieha, 94 Tex. 430, 61 S. W. 115, is, as stated by appellants, that insanity may be pleaded in avoidance of a civil contract, even against one who dealt with the lunatic in utmost good faith; the burden is upon the party claiming under the contract to plead and prove that the lunatic still has in his possession the property received under the contract, or property acquired therewith, or that the money received under the contract was expended for him or by him for necessaries. In the case cited, it was held that, in the absence of proof that the lunatic still had in his possession "any of the money paid for the land or any property acquired with it, nor that it had been expended for him or by him in the purchase of necessaries," he would not be required to return the consideration received.

In Brown v. Brenner (Tex. Civ. App.) 161 S. W. 14, appellants contended for a restoration of the money paid to the lunatic. In answer to that contention the court said: "To entitle appellants to this character of relief it was incumbent upon them to show by their pleadings for affirmative relief, and to establish by evidence, that the money received by Henry Brenner from Carrie Brown was expended for necessaries, or that it was on hand at the time of his death, or that it had been invested by or for him for the benefit of his estate. In the absence of such proof, plaintiffs would not be required to return the consideration."

In Shaw v. Gillespie (Tex. Civ. App.) 270 S. W. 1043, the court held that the burden was upon the defendant resisting cancellation to plead and prove that the consideration was expended for necessaries, or that it was in the hands of the lunatic, or had been invested for his benefit, and, in the absence of such pleading and proof, he was not entitled to judgment for the consideration paid on the contract. As we understand the authorities, they all follow without modifying

in the least the rule as announced in Williams v. Sapieha, supra. It is peculiarly the province of the Supreme Court to formulate the law, either by its own decision or by express approval of the decisions of the Courts of Civil Appeals. It is the clear duty of the Courts of Civil Appeals to give effect to the law announced by the Supreme Court. As appellants correctly concede that the law as announced by the Supreme Court is against their construction of appellees' petition, it becomes our duty to overrule all demurrers and assignments against the sufficiency of appellees' petition in this case.

■ The sixth assignment of error is that the court erred in submitting the issue to the jury on the ground that "the evidence did not warrant the submission of said issue." The seventh assignment is that "the verdict of the jury in answer to said special issue and the judgment of the court thereon is contrary to and not supported by the testimony, because all the testimony shows that Minnie Lee Bovender had sufficient mental capacity to execute the note and deed of trust sued on." There is no assignment that the verdict of the jury answering the special issue was so against the great weight and preponderance of the evidence as to be clearly wrong. Appellants requested a peremptory instruction, first for the full amount of their note; second for $1,163; and third, they complained of the court's judgment, because they were not awarded recovery for $250. Under the evidence, the court did not err in refusing appellants' peremptory instruction. Because of the peculiar nature of the evidence in this case, it becomes necessary for us to make a very extended statement of the evidence on the issue of Minnie Lee Bovender's mental capacity.

R. H. McDill, a witness for plaintiff, testified: "I am acquainted with Miss Bovender. I have known her about four years. * * * I saw her about August or September, 1924, in the office several times. As to what she did to cause me to think she appeared unnatural—she wanted to change her stepfather's beneficiary and I told her she could not do that except at his request. * * * I have seen her a number of times in the last three or four years. * * * Considering all the facts * * * I would say that Miss Bovender was of unsound mind. The first time Miss Bovender talked to me she told me what she wanted. She wanted to change the beneficiary of her father's policy. * * * She wanted to cash the policy and told me that was what she wanted. I think she knew what she wanted to do with it."

Cora Wolfe, a witness for plaintiff, testified: "I have known Miss Bovender twelve or fourteen years. She had a nervous breakdown four or five years ago, at the time she was working for Sanger Bros. * * * I remember the time she executed some notes or papers on her property. * * * I noticed something unnatural about her after her nervous breakdown. She would be talking along and then say: 'What was I talking about?' She would talk foolishly and say foolish things. Maybe she would have a number of dresses all alike. I said she acted unnatural and did unnatural things. I think her condition is just about the same as it was right after she had her nervous breakdown. From what I know of her and have observed I do not think her competent to handle her affairs. She has had to depend on some one else for the last four or five years. I don't think she knows how to attend to anything. Mr. Boyd has helped her. She understands what I say to her. Sometimes I think she does, but that doesn't mean she is competent. She understands what you say to her at the time but in a little while she cannot tell you what was said. If you ask her a question, she answers you intelligently and seems to understand what you say. Then there are times when she doesn't. She was worrying about the paving assessment against her property. * * * I don't know that she knew the property was liable for the debt."

B. P. Roberts, a witness for plaintiff, testified: "I am engaged in the grocery and market business. I know Miss Bovender. My business is about a half block from her. I have known her four or five years, knew her in 1924, in October. Saw her every two or three days. As to whether I noticed anything unnatural—her mother was buying groceries from me. One time her mother came in and bought some groceries and about thirty minutes Miss Bovender came to my store and told me not to sell her mother anything else; that if I did she was not going to pay for it. She talked about her expenses and her mother, and about her dogs. I knew about her signing the notes on her property in 1924. In holding conversations with her around the store and in talking with her I would not consider her a person competent of attending to business matters of any kind. Miss Bovender bought provisions and groceries at my store. She knew what she wanted. She would pay me like anybody else. She always paid the price asked. I know when she buried those dogs. She kept them around the house there two or three days after they were dead and tried to get an undertaker and casket to bury the dogs."

Dr. J. S. Tomkies, a witness for plaintiff, testified:

"I am a practicing physician. I first examined Miss Bovender the 9th of March, 1925. I made a record at that time. The record is made from what the patients tell us. As to what her physical and mental condition was in March, 1925, she was greatly over weight, her hips were entirely too large, she had a double chin, she was out of proportion. She answered questions very poor-

ly. Her mental condition was such that I could not help her very much. In my opinion she had been that way for several years. Her mental condition was about twelve or fourteen' years of age. A person should be able easily to get the confidence of a person like that. I expect they could get her confidence and get everything she had. She would form new acquaintances quickly and drop them just as quickly. As to what she told me her ailments were, she complained of bladder trouble, high blood pressure and was nervous at that time. As to what other statements she made about the bladder trouble, I believe the record says:

" 'Nocturio three or four times; no day frequency; no burning; no dysuria, that is, no pain; no blood or pus; high blood pressure; no dizziness; no hot or cold sensations; weak spells occasionally; nervousness; mind does not work; can't remember; worries a lot; sleeps well; nervous breakdown two years ago; mother's expenses; street paving and vacant apartment; crooks got her to sign papers for her lot.'

"She told me about her vacant property and about the debt on her paving and said some crooks had gotten her to sign some papers. She told me about that. She understood what the note was about. She understood my questions to her and I understood her answers. I got the information contained in this record from her. If she wanted to borrow some money I think she would have sufficient mental knowledge to execute that. At times she could rib herself up to it and have her mind under proper control and be able to mind business affairs. If she wanted to borrow $1,500.00 and give a note for it I should think she would have sufficient knowledge to comprehend that and that if she didn't repay it they could take her property, if that was properly explained to her. She could understand what a note is. She has sufficient knowledge to understand that. There is no doubt about that. She has sufficient mental capacity to know what she is doing."

T. J. Tenison, a witness for plaintiff, testified: "I am engaged in the plumbing business. I know Miss Bovender. I have known her three or four years. I saw her in October, 1924. I remember about the time somebody got her to sign notes against her property. She does not seem to have any recollection and would tell me secrets about her business that I didn't think she ought to tell. She acted and talked in a way I didn't think she was right someway. As to what she did or said that caused me to think she was not exactly right—she would come around while I was doing the plumbing and different things. She could not carry on a coherent, connected conversation. I don't hardly think she had the capacity to transact business or understand the character of a business transaction. * * * As to

whether she acted natural, she acted natural as far as she was concerned, but she didn't act like other people. She was telling me her troubles. That was natural, I suppose. People are discussing their troubles with me all the time. In the business transactions I had with her, she knew what she was talking about."

Mrs. R. T. Hunt, a witness for plaintiff, testified: "I know Miss Bovender—have known her about twenty-three years. Her mind did not seem to be right. Before she quit Sangers she had a nervous breakdown. As to what she did I thought seemed unnatural—maybe she would see a dress that she would like and she would make four or five like it. She seemed to have a changed condition of mind after her nervous breakdown. As to what was the condition of her mind at that time—she would be talking and forget what she was talking about. * * * As to whether she would know what you were talking about, she might know what you said, but I can't say that she would know the effect of it. She can understand what you say to her. You can understand what she says to you. I don't believe she is competent to attend to business matters. * * * She told me that she had signed some notes and that she had been doped."

Mrs. J. H. Gentry, a witness for plaintiff, testified: "I have known Miss Bovender four or five years—have seen her in the last three or four years. After she quit Sanger Bros. she acted so peculiar. She got to acting so peculiar and crazy I just quit going with her. She could not carry on a straightforward conversation. She would talk about something and forget she was talking about it. She would tell everybody her secrets, strangers and friends. I don't think she had sufficient mind to carry on business of any kind. * * * There are times when I do not think she understands what you say to her and then there are times when I think she does. She answers questions intelligently. I think if she borrowed $500.00 that she would know she had to pay it back. If she gave property as security, I believe she would have sense enough to know that if she didn't pay it back they could take her property."

Mrs. Mildred Harper, a witness for plaintiff, testified: "I met Miss Bovender September, 1923, and lived in her apartment. Came back September 20, 1924. I saw Miss Bovender the next day. She wasn't herself at all. She acted peculiarly. That was September 21, 1924. She acted unnatural—like she didn't know what she was doing. She didn't seem to me like she was in her right mind. She would starve herself and buy meat for her dog she had. I have seen her make a number of dresses the same color or the same pattern. * * * She told me about some people getting her to sign some notes. She said some crooks got her to sign them."

J. F. Rhodes, witness for plaintiff, testified: "I know Miss Bovender. I have seen her a number of times within the last five or six years. She wouldn't seem to know just what she wanted. She didn't seem just right. She couldn't tell you what she wanted and when you told her what to do she didn't seem to know what to do or say—was more like a child. * * * From working and dealing with her, I would say that she was not much capable of attending to business affairs. I believe Miss Bovender is of unsound mind. I saw her during 1924. Her mind didn't seem just right during 1924. I don't think she had sufficient ability to understand the nature and character of deeds of trust and things like that. * * * If Miss Bovender borrowed some money and gave her notes she might understand that. If she borrowed the money she would understand that she would have to pay it back, if somebody explained that to her."

Pat Richards, a witness for plaintiff, testified: "I am Deputy Sheriff. In 1924 I was Special Investigator in the District Attorney's office. Shelby Cox was District Attorney. I have seen Miss Bovender in her home. We were making an investigation regarding the activities of a Mr. Ray. When we got out there we found Miss Bovender at home. She had then moved to Rosemont Street. She was sitting at a table with a typewriter writing some letters trying to sell some stock in a concern. She said she was president and bought $20,000.00 of the stock; that she was president and treasurer. We asked her how much money she had in the treasury. She said she didn't know—said they didn't have any; that she was fixing to send out the letters to sell the stock. We went out again to see Miss Bovender and she had been hid out. We located her and brought her to the District Attorney's office. I believe I have had experience sufficient to know whether a person is mentally capable. In talking with this woman, as to whether she impressed me at the time as knowing what she was doing, I don't think she knew at that time. I don't believe she had the mental capacity to attend to business. If she executed a note I don't believe she would realize that it was a debt against her property. She told us when we went to Rosemont that that was her property. As to whether she told us that she had signed a mortgage on this property, she said she had deeded it; had traded it for stock in the company. As to whether she told us she had signed a mortgage before she executed the deed, I don't remember the details. She appeared to understand what she was doing out there, but didn't realize what had happened until she was brought to the District Attorney's office. I understood what she said to me concerning this property. If Miss Bovender came to me to borrow some money and asked me to let her have it, she

might understand that. If she signed a note I don't know whether she would understand that or not. I don't think she would understand the liability on the note. I think she has sufficient capacity to live by herself, buy all her provisions, take care of her bills, etc. In this Ray matter, we expected to make a case entirely on her testimony, and were basing the case on the testimony of Miss Bovender."

Shelby Cox, a witness for plaintiff, testified: "I was District Attorney of Dallas County in September and October of 1924. I remember Miss Bovender being in my office, the occasion being in connection with the investigation of Ray. She was in there on several different occasions. In dealing with all kinds of cases I have had occasion to observe her mental capacity. From her actions and conversations, as to whether she impressed me as being possessed of sound or unsound mind, well, one time she would be against Ray bitterly and the next time she would want us to dismiss the case. From what I saw and observed at that time my opinion was she was of unsound mind. As to whether I think she had mental capacity to understand what a deed or note was at that time, that is hard to answer. Sometimes when you talked to her she seemed to understand. Other times, she does not. She impressed me as having a very low grade of mentality. There are times when she seemed to understand perfectly."

E. E. Hendricks, a witness for plaintiff, testified: "I have known Miss Bovender for four and a half years. Knew her in 1924. In talking with her I noticed something unusual in her conversation. I don't think she was normal. She was a fanatic along some lines. * * * She is a person you can influence. She has a mind sorter like a child. * * * I doubt if she would realize if she signed a note that you could take her place. * * * A person might get her to sign a note without giving her any money at all. * * * If she borrowed money and was given a note and told it was a note against her property for the money, I don't think she would know the effect of it then. If she executed a mortgage I doubt if she would realize what she was doing."

Allen Seale, a witness for plaintiff, testified: "In September and October, 1924, I was investigator in the District Attorney's office. I met Miss Bovender. She told us she had traded her property for some stock in the company and that she was secretary and treasurer. As to whether she acted like a person that knew what she was talking about, well, she didn't know. I have dealt with a great many people. From my experience I would say, on the occasions I saw her, she acted unnatural in any way, I thought she acted unnatural all the time. I don't think she had the capacity or was competent to look

after business affairs. She was not conscious of what she was doing. If she had been she wouldn't have put her trust in Ray. We were trying to get a case against Ray. That was the purpose of the investigation. The State used her as a witness in that case. She didn't ever seem right to me. She told us about deeding that property for some of the stock. She told that intelligently—that she had deeded her property."

Mrs. S. T. Thornhill, a witness for plaintiff, testified: "I am a cousin of Miss Bovender. In 1924 she was a person who would be easily persuaded and led. I have noticed some peculiarity in her actions and conversation. She would have a number of dresses of the same type, and buy food for her dog and go without herself. Her conversation would be disconnected and would not be coherent. I consider she was very incapable to transact business. I don't think she was capable in October, 1924, of knowing the effect of a note and deed of trust. I don't think she would understand them. I don't think she had the capacity to know what she was doing when she executed these notes. * * * I saw her in September, August and October, 1924. Her mind was unbalanced at that time before and after."

Mrs. Alice Huff, a witness for plaintiff, testified: "Miss Bovender is my daughter. It looked like she didn't know the wrong people. She would take up with anybody that would take an interest in her. She would do the wrong thing and associate with wrong people. * * * I don't think she is capable of looking after business. Minnie's memory is not good. She has been in that condition five or six years. * * * Sometimes she answers your question intelligently, and part of the time she doesn't. A part of the time she is raving. When she wasn't raving you could talk to her and she would answer your questions. She wasn't raving all the time."

Arnold Boyd, a witness for plaintiff, testified: "I know Miss Bovender. I have known her five or six years. I collected her rents for about three years. * * * She didn't seem exactly right. She didn't seem to realize or know the effect of what she was doing. I don't think she would be able to attend to business. She would be easily led. She has the mental capacity of about a twelve year old child. * * * I talked to her at the time she moved. I asked her what she was doing. She said she had a $50.00 a week position. I told her she was doing wrong moving. She said she was buying another place. Her actions were peculiar. She didn't known what she was talking about. * * * When you talk to her she understands at the time what you are talking about and then the next day she wouldn't. * * * If you were talking to her about a deed of trust or something like that I don't think she would understand. I don't think she would realize what business was."

As against appellee's testimony, appellants offered a large number of witnesses who had known Miss Bovender more or less intimately, and who testified, in substance, that she was a woman of some peculiarities, but of ordinary intelligence and capable of attending to ordinary business transactions and of understanding the effects of her contracts. They offered in evidence the note and deed of trust, and the notary who took her acknowledgment to the deed of trust testified that she understood the effect of her contract and gave her acknowledgment as is done by a person of ordinary intelligence. We believe the evidence offered by appellees was sufficient to raise the issue submitted by the court to the jury. It was shown that Miss Bovender had suffered a nervous breakdown; that she had the mind of a child 12 or 14 years old; that she was silly in her conversations; that at times she "raved"; that her memory was poor; that at times she could not understand what was said to her; that she would starve herself and buy food for her dogs; that the grief over the death of her dogs was unnatural, etc. On the facts and circumstances brought to their attention, many of her neighbors and friends and intimate social and business associates testified that she was of unsound mind; that she did not understand business transactions, and was incapable of appreciating and understanding the effect of her contracts. Though appellants strongly rebutted the case made by appellees, yet in our judgment the issue remained as one for the jury. We believe the facts of this case are stronger in favor of the jury's verdict than in Caddell v. Caddell, 62 Tex. Civ. App. 461, 131 S. W. 432; Farmers' State Bank v. Farmer (Tex. Civ. App.) 157 S. W. 283, where it was held that the issue of want of mental capacity was raised.

Appellants cite Gerlich v. Myers (Tex. Civ. App.) 290 S. W. 271; Milner v. Sims (Tex. Civ. App.) 171 S. W. 784; Whitney v. Murrie (Tex. Civ. App.) 264 S. W. 270; Vaughan v. Malone (Tex. Civ. App.) 211 S. W. 292; Kerbow v. Sprinkles (Tex. Civ. App.) 264 S. W. 115; Cox v. Combs, 51 Tex. Civ. App. 346, 111 S. W. 1069. In each of these cases the appellate court carefully reviewed the testimony and held that there was no evidence of want of mental capacity. In none of them was the evidence as strong, direct, and positive as in this case. In fact, as we understand the appellants' cases, there was no evidence that the alleged lunatic did not understand what he was doing. Here the issue was clearly raised that Minnie Lee Bovender did not know what she was doing, nor the effect of her act at the time she executed the note and deed of trust.

If we construe the evidence as showing that Miss Bovender was paid $1,163 on the

note—the balance was consumed in brokerage charges, fees, etc.—appellants here were not entitled to recover that sum, since it was not shown that she had it in her possession, nor that it had been expended for her benefit, nor that it was invested in her estate. It was shown that the sum of $250 was invested for her as the cash payment on certain real property bought by her at the time the note was executed, but as she was not able to continue the payments and lost this property, and as this sum was not a part of her estate, appellants were not entitled to judgment therefor.

The court gave the following definition of mental capacity: "To aid you in answering this question you are instructed that by the term 'mental capacity' is meant that at the time of executing the note and deed of trust that the said Minnie Lee Bovender must have had sufficient mind and memory to intelligently understand the nature and effect of her act in executing the note and deed of trust upon her property."

The form of the issue, except as to introductory matter, has already been given. Appellants excepted to the form of the issue and to the court's definition on the following grounds:

(a) Instead of inquiring whether Minnie Lee Bovender had sufficient "mental capacity to execute said note and deed of trust," the issue should have been whether she "at the time of executing the note and deed of trust had mental capacity to reasonably understand the business in which she was engaged and the effect of her act."

(b) The court erred in not instructing the jury that it was to consider her mental capacity only at the time of executing the note and deed of trust.

(c) The court erred in its definition of "mental capacity," "because it placed a greater burden upon the defendant than the law required and required a greater degree of mind and memory and of mental capacity than required by law, the law not requiring that Minnie Lee Bovender should have sufficient mind and memory to intelligently understand the nature and effect of her acts in executing the note and deed of trust, but only requiring that she have sufficient mental capacity to be able to understand the nature of the business she was engaged in and the effect of her acts, the law not requiring that she should understand the nature and effect of her acts in executing the note and deed of trust and not requiring that she should intelligently understand the nature and effect of her acts in executing said note and deed of trust, but requiring only that she have sufficient mental capacity to reasonably understand the same."

■■ These exceptions do not present error. The charge as given fairly and accurately submitted all the principles involved in appellants' exception. Had the court, as requested by appellants, submitted the issue "whether Minnie Lee Bovender, at the time of executing the note and deed of trust, had mental capacity to reasonably understand the business in which she was engaged and the effect of her act, nothing would have been carried to the jury or withdrawn from it which was not actually submitted by the question given. The issue of want of mental capacity, of course, had reference to the time when Miss Bovender executed the note and deed of trust and not to any time before or after their execution. But the testimony was to the effect that the condition of her mind was permanently impaired, a continuing condition, and that that condition had existed long before the execution of these instruments. There was no testimony that she was rational at times and irrational at other times. It is true that some of the witnesses testified that she appeared at times to understand what was said to her and at other times she did not have that capacity, but all the testimony on the issue of want of capacity was to the effect that she had the mind of a child 12 or 14 years old; that she was easily led and influenced by others; that her memory was bad; that she was not able to understand what she was doing, etc. If the issue of want of mental capacity was raised, that condition existed before these papers were executed and at the time. We do not mean by this to say that all the evidence was to the effect that she was irrational. Appellants made a strong case of capacity to execute the contract, but their testimony was a continuing and not an intermittent capacity. The exceptions to the court's definition point out no error.

■ The court did not err in receiving testimony of the mental condition of Miss Bovender prior to the execution of the contract. The prior condition of the mind was a proper subject of inquiry. Williams v. Sapieha, supra; Rowan v. Hodges (Tex. Civ. App.) 175 S. W. 847.

■ The court did not err in permitting the witness R. H. McDill to testify that Miss Bovender did not seem to him to be a "natural person," and that he considered her of "unsound mind." This witness gave the facts upon which he based his conclusion, showing that he was qualified, because of his observance of her, to answer the question asked.

No error was committed in receiving the testimony of Cora Wolfe, to the effect that she noted unusual conditions in the conduct of Minnie Lee Bovender after her nervous breakdown. This testimony was objected to on the ground that it did not confine the answer of the witness to the date on which the papers were executed. Under the Williams Case, supra, this testimony was admissible.

On the principles just discussed, the court did not err in permitting J. F. Rhodes to testify that from his many years' experience in

talking with and meeting the public and in talking with them about various matters, and from his observations and dealings with Miss Bovender, he considered her of unsound mind.

█ No error was committed in permitting Pat Richards to answer the question: "Now in talking with her (Miss Bovender) did she do anything that impressed you as not knowing what she was doing?" This was objected to on the ground that it called for the conclusion of the witness and referred to a time several months after the execution of the papers. Appellants moved to strike out all the testimony of the witness Pat Richards, including that quoted above in our opinion. No error was committed in overruling this motion, since this testimony was admissible.

Appellants also moved to strike out the testimony of the witness Seale, sheriff of Dallas county. No error was committed in overruling that motion. On the foregoing propositions of evidence, see Adams v. Adams (Tex. Civ. App.) 253 S. W. 605.

█ Exceptions were reserved to the following remarks of Hon. Vess Jones, attorney for appellee: "See all this host of witnesses here representing the Stewart Title Guaranty Company, testifying in behalf of the defendant." This remark was objected to, the objection sustained, and the jury instructed not to consider it. Under the instructions of the court, this argument did not constitute reversible error.

Finding no errors in the record, the judgment of the trial court is in all things affirmed.